**APPLERA CORPORATION, Plaintiff**

v.

**MICHIGAN DIAGNOSTICS, LLC, Defendant.**

**Civil Action No. 07–CV–10547–GAO.**

United States District Court, D. Massachusetts.

Jan. 27, 2009.

Roy J. Coleman, Kirk C. Teska, Iandiorio & Teska, Waltham, MA, Scott E. Erlich, Eric N. Shor, Nutter, McClennen & Fish, LLP, Boston, MA, David Oppenhuizen, Arnold S. Weintraub, The Weintraub Group, P.L.C., Farmington Hills, MI, for Defendant/Counter Claimant.

T. Christopher Donnelly, Jill Brenner Meixel, Adam B. Ziegler, Donnelly, Conroy & Gelhaar, LLP, Boston, MA, for Plaintiff/Counter Defendant.

*OPINION AND ORDER*

O'TOOLE, District Judge.

## I. Background

The plaintiff, Applera Corporation, acting through its division Applied Biosystems Group ("Applied Biosystems"), alleges in its amended complaint that the defendant, Michigan Diagnostics, LLC ("Michigan Diagnostics") has infringed three of its patents: U.S. Patent No. 6,514,717B2 (the '717 Patent), U.S. Patent No. 6,322,727B1 (the '727 Patent), and U.S. Patent No. 6,107,024 (the '024 Patent). These patents relate to kits used for detecting a substance in a sample through the generation of light (chemiluminescence) by activating and decomposing stabilized 1,2–dioxetanes. Applied Biosystems alleges that Michigan Diagnostics has directly and indirectly infringed these patents in violation of 35 U.S.C. § 271(a)-(c).

All three of these patents have apparently expired for various reasons. In its original complaint, Applied Biosystems acknowledged that the '717 Patent had expired, but alleged past infringement of that patent and ongoing infringement of the '727 Patent. After being informed by Michigan Diagnostics that the '727 Patent had expired, Applied Biosystems amended its complaint to allege only past infringement of that patent. It also added a claim for infringement of the '024 Patent, which has similarly turned out to have expired.

Applied Biosystems now seeks leave to file a second amended complaint which would modify its allegations as to the '024 Patent in light of its expiration, allege infringement by Michigan Diagnostics of five additional patents, and add a new defendant, Dr. Benjamin Giri, the co-founder and co-owner of Michigan Diagnostics. Michigan Diagnostics opposes the motion to amend.

In response to the existing complaint, Michigan Diagnostics has asserted counterclaims against Applied Biosystems. Invoking the Declaratory Judgment Act, 28 U.S.C. § 2201 ("DJA"), it seeks a declaration of non-infringement as to sixty-two Applied Biosystems patents. It also counterclaims for patent misuse, unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and *Walker Process* fraud in violation of the Sherman Act, 15 U.S.C. § 2. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). Applied Biosystems has moved to dismiss these counterclaims.

Because it will aid the analysis of the counterclaims to know whether additional infringement claims are part of the case, I turn first to whether Applied Biosystems should be granted leave to amend its complaint.

## II. Motion for Leave to File a Second Amended Complaint

■ As noted, Applied Biosystems proposes to amend its complaint to add infringement claims as to five new patents and to add Dr. Giri as a defendant. Its proposed second amended complaint alleges that Dr. Giri is personally liable for direct and indirect patent infringement, having been personally and actively involved in the infringing activities and in activities that he knew would induce others to infringe. It also contains veil-piercing allegations that Dr. Giri is liable for Michigan Diagnostics' infringement because it is a sham company and alter ego of Dr. Giri.

■ Leave to amend a complaint should be given freely "when justice so requires." Fed.R.Civ.P. 15(a)(2). This standard reflects the liberal amendment policy underlying Rule 15. *O'Connell v. Hyatt Hotels of P.R.*, 357 F.3d 152, 154 (1st Cir.2004). "Grounds for denial generally involve un-

due delay, bad faith, dilatory motive of the requesting party, repeated failure to cure deficiencies, and futility of amendment." *U.S. ex. rel. Rost v. Pfizer*, 507 F.3d 720, 733–34 (1st Cir.2007) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

Michigan Diagnostics argues that Applied Biosystems has not provided a sufficient reason why it should be allowed to amend its complaint a second time. It particularly argues that Applied Biosystems has not proffered any exhibits that provide a basis in fact for its new infringement allegations or for its allegations against Dr. Giri. It faults Applied Biosystems for having "made no effort to determine the veracity of its accusations in the Second Amended Complaint" by, for example, deposing Dr. Giri. (Def. Michigan Diagnostics' Resp. to Applera Corp.'s Mot. for Leave to File Second Am. Compl. 9.) This argument puts the cart before the horse. Applied Biosystems need not prove its claims before making them, and to the extent this argument is directed at the futility of amendment it falls far short of the mark.

■ Michigan Diagnostics also contests Applied Biosystems' allegation that Dr. Giri "has been responsible for all of Michigan Diagnostics' research and development activities since its founding," (Pl. Applera Corp.'s Mem. in Supp. of its Mot. for Leave to File Second Amended Compl., Ex. A, pt. 1, ¶ 4), and suggests that this is false because "Dr. Giri has been listed as a co-inventor on at least one of Michigan Diagnostics' published patent applications." (Def. Michigan Diagnostics' Resp. to Applera Corp.'s Mot. for Leave to File Second Am. Compl. 9.) This modest non-sequitur would be relevant, if at all, to the merits of Applied Biosystems' allegations, but such a dispute of fact does not counsel

against granting Applied Biosystems leave to amend.

Michigan Diagnostics further states that Applied Biosystems' request for leave to amend is made in bad faith. Its argument in this respect is based principally on Applied Biosystems having twice alleged the ongoing infringement of patents that were actually expired. This latter observation point is fair enough, but there is no suggestion—or better yet, information—that any of the new infringement allegations repeat the problem.

■ The argument that the new claims are made in bad faith is that Applied Biosystems is asserting successive claims on new patents in order to draw out litigation. This same assertion is employed in support of the contention that Applied Biosystems has a dilatory motive and that amending the complaint will cause undue delay. However, the motion to amend is within the Court-approved schedule established on the basis of the parties' joint proposal and prior to the close of discovery and any summary judgment motions. Michigan Diagnostics has already counterclaimed seeking a declaration of non-infringement as to sixty-two Applied Biosystems patents, including four of the five new patents sued on in Applied Biosystems' proposed second amended complaint. Any "delay" occasioned by the need to address the new claims is not undue.

Accordingly, Applied Biosystems' motion is granted and it may file its second amended complaint as proposed.

### III. Motion to Dismiss Counterclaims

Applied Biosystems has moved to dismiss Michigan Diagnostics' counterclaims. It argues that Michigan Diagnostics' counterclaim seeking a declaration of non-infringement fails to present a case or controversy and therefore must be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. It further contends that Michigan Diagnostics' counterclaims for patent misuse, unfair competition, and *Walker Process* fraud each fail to state a claim upon which relief can be granted and must be dismissed pursuant to Rule 12(b)(6).

### A. Counterclaims for Non–Infringement of Additional Patents

■ In the first of its counterclaims, Michigan Diagnostics seeks a declaration of non-infringement as to sixty-two Applied Biosystems patents. With the filing of the second amended complaint, Applied Biosystems alleges the infringement of seven of these sixty-two patents. The other fifty-five are simply other patents held by Applied Biosystems. Applied Biosystems argues that this Court lacks subject matter jurisdiction over Michigan Diagnostics' counterclaims for a declaration of non-infringement of these additional patents because no justiciable case or controversy exists as to those fifty-five patents. I agree.

The DJA provides that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The requirement that there be a "case of actual controversy" has been interpreted to refer "to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) (citing *Aetna Life Ins. of Hartford, Ct. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937)).

■ Until recently, the Federal Circuit[1] employed a two-part test to determine the existence of a sufficient "case or controversy": (1) whether conduct by the patentee creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit; and (2) whether conduct by the declaratory judgment plaintiff potentially constitutes infringing activity or demonstrates concrete steps taken with the intent to conduct such activity. *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1379 (Fed.Cir.2007); *see e.g., Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (1988).

In 2007, the Supreme Court rejected the Federal Circuit's "reasonable apprehension of suit" test in *MedImmune*, 549 U.S. at 126–32, 127 S.Ct. 764. The specific question the Court considered was whether Article III and the DJA require "a patent licensee to terminate or breach its license agreement before it can seek a declaratory judgment that the underlying patent is invalid, unenforceable, or not infringed." *Id.* at 120–21, 127 S.Ct. 764. MedImmune was a drug manufacturer that agreed to a licensing agreement with a patentee, Genentech, allowing it to sell products the sale of which would otherwise infringe on one or more claims of Genentech's patents. *Id.* at 121, 127 S.Ct. 764. The Court held that subject matter jurisdiction existed despite the fact that "the continuation of royalty payments [by the licensee] makes what would otherwise be an imminent threat at least remote, if not nonexistent." *See id.* at 128, 127 S.Ct. 764.

■ In rejecting the "reasonable apprehension of suit" test, the Court stated that "[t]he rule that a plaintiff must destroy a large building, bet the farm, or (as here)

risk treble damages and the loss of 80 percent of its business, before seeking a declaration of its actively contested legal rights finds no support in Article III." *Id.* at 134, 127 S.Ct. 764. The Court noted that there is no bright-line test, but that:

Our decisions have required that the dispute be "definite and concrete, touching the legal relations of parties having adverse legal interests"; and that it be "real and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be under a hypothetical state of facts."

*Id.* at 127, 127 S.Ct. 764 (quoting *Aetna*, 300 U.S. at 240–41, 57 S.Ct. 461). Under "all the circumstance ..." there must be "a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)).

Following *MedImmune*, the Federal Circuit held in *SanDisk* that an Article III case or controversy giving rise to declaratory judgment jurisdiction existed based upon substantial and detailed pre-litigation discussions between the parties about infringement and licensing. *See* 480 F.3d at 1382. The declaratory judgment plaintiff—Sandisk Corp. ("Sandisk")—and STMicroelectronics ("ST") were competitors in the flash memory storage business. *Id.* at 1374. The relevant interactions began when ST sent a letter to SanDisk requesting a meeting to discuss a possible cross-license agreement, listing eight patents owned by ST that it suggested "may be of interest." *Id.* A second letter from

---

**1.** Federal Circuit law governs this inquiry because the underlying merits of the action involve patent infringement. *See Microchip*

*Tech. Inc. v. The Chamberlain Group, Inc.*, 441 F.3d 936, 940 (Fed.Cir.2006).

ST reiterated the request and listed four additional patents to be considered. *Id.* The parties had a number of business meetings at which possible infringement and possible cross-licensing were explored in some depth. *Id.* at 1374–75. At one meeting to discuss possible licensing, ST requested that the discussion be considered a settlement discussion under Federal Rule of Evidence 408. *Id.* at 1375. It then presented a slide show that referred to SanDisk's "unlicensed activities" and made a four-to-five hour technical presentation identifying the specific claims of each ST patent and how they might be infringed by SanDisk. *Id.* ST gave SanDisk a packet of materials that included a copy of fourteen ST patents, reverse engineering reports for SanDisk products, and diagrams showing how elements of ST's patent claims covered SanDisk's products. *Id.* For its part, SanDisk also made a presentation describing its own patents and explaining how ST's product infringed. *Id.* At the end of the meeting, ST's vice president of intellectual property and engineering told SanDisk's chief intellectual property counsel that "ST has absolutely no plan whatsoever to sue SanDisk." *Id.* at 1376. After further correspondence that involved SanDisk making a confidential cross-licensing offer and attempts to set up another meeting, SanDisk filed suit alleging infringement of one of its patents and seeking a declaratory judgment of non-infringement and invalidity of ST's patents. *Id.*

Considering *MedImmune*, the Federal Circuit said:

> In the context of conduct prior to the existence of a license, declaratory judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee.

> But Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do.... We hold that where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise....

*Id.* at 1380–81. The court held that the interaction between SanDisk and ST sufficed to present a case or controversy. *Id.* at 1382. ST sought royalty payments "under its patents based on specific, identified activity." *Id.* It communicated a detailed infringement analysis, "which identified, on an element-by-element basis, the manner in which ST believed each of SanDisk's products infringed the specific claims of ST's patents." *Id.*

The court also held that the express statement that ST had no plan to sue SanDisk did not prevent the existence of a sufficient controversy, because ST had "engaged in a course of conduct that shows a preparedness and willingness to enforce its patent rights...." *Id.* at 1383. The fact that ST stated thereafter that it did not intend to sue constituted "the kind[ ] of 'extra-judicial patent enforcement with scare-the-customer-and-run tactics' that the Declaratory Judgment Act was intended to obviate." *Id.* at 1383 (quoting *Arrowhead*, 846 F.2d at 735).

In *Sony Electronics, Inc. v. Guardian Media Technologies, Ltd.*, 497 F.3d 1271, 1273 (Fed.Cir.2007), declaratory judgment actions were brought by Sony Electronics, Inc. ("Sony") and other electronics companies against Guardian Media Technologies,

Ltd. ("Guardian") seeking a declaration that two Guardian patents relating to the "V–Chip" parental television blocking device were not infringed and were invalid and unenforceable. As in *SanDisk*, there was a substantial and detailed correspondence between the parties prior to litigation. *See id.* at 1274–1281. Guardian sent the plaintiffs letters entitled "Notice of Patent Infringement," which identified both specific infringing products and specific claims of the patents said to be infringed. *Id.* at 1274, 1276, 1279. It provided claim charts for its two patents that described each claim it believed to be infringed and stated the basis for that belief, limitation-by-limitation. *Id.* at 1274, 1277. Guardian requested meetings, mentioned royalties and compensation for products previously sold, offered a license, and exchanged correspondence regarding invalidity and prior art. *Id.* at 1275–81. Each of the plaintiffs separately filed complaints under the DJA, which were consolidated by the district court. *Id.* at 1281. The district court granted Guardian's motion to dismiss for lack of subject matter jurisdiction on the ground that there was no actual controversy because Guardian had not expressly threatened to sue any of the plaintiffs for infringement, nor did its actions amount to an implicit threat. *Id.* at 1281.

The Federal Circuit vacated the district court's dismissal. *Id.* at 1289. It explained that "the Declaratory Judgment Act was intended to fix the problem that arises when the other side does not sue." *Id.* at 1284. The "parties had taken adverse positions" on the issues of infringement and validity. *Id.* at 1285. Guardian had "explicitly identified" the patents and the specific claims of those patents which it asserted were infringed, as well as the specific products it believed were infringing. *See id.* at 1285. The plaintiffs, in turn, had identified "specific prior art references" that they believed rendered the claims invalid. *See id.* at 1285–87. As to Sony, the court summarized that "[i]n short, because Guardian asserts that it is owed royalties based on specific past and ongoing activities by Sony, and because Sony contends that it has a right to engage in those activities without a license, there is an actual controversy between the parties within the meaning of the Declaratory Judgment Act." *Id.* at 1286. The court came to similar conclusions as to the other plaintiffs. *Id.* at 1286, 1287.

■ Here, Michigan Diagnostics acknowledges that it bears the burden as the party claiming declaratory judgment jurisdiction to show that it existed at the time its counterclaims were filed. *See Benitec Austl., Ltd. v. Nucleonics, Inc.,* 495 F.3d 1340, 1344 (Fed.Cir.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 2055, 170 L.Ed.2d 811 (2008). It argues that an actual controversy exists because the parties have established adverse legal interests. Michigan Diagnostics alleges that Applied Biosystems "sent a letter to Michigan Diagnostics advising Michigan Diagnostics of its extensive patent portfolio and notifying Michigan Diagnostics that it may be infringing patents owned by [Applied Biosystems]." (Michigan Diagnostics LLC's Answer, Affirmative Defs., and Countercls. 8 ¶ 10 [hereinafter Ans. and Countercls.].) It further notes that "[m]inor dialogue occurred between the parties and a meeting was tentatively scheduled in January, 2007, but it never occurred." (*Id.* ¶ 11.)

Michigan Diagnostics has attached to its brief copies of letters between the parties which preceded this litigation. On July 13, 2006, Counsel to Applied Biosystems sent a letter to Dr. Giri of Michigan Diagnostics that stated:

In view of certain activities of your company, including your commercially avail-

able enzyme triggerable dioxetanes, we believe you should review our U.S. patents listed on the enclosure to this letter. We have included the independent claims in the enclosure as well. These patents were originally assigned to Tropix Inc. and are now part of the Applied Biosystems patent portfolio.

We propose a meeting to discuss your relevant products in light of our patents with a view toward entering into licensing discussions. We would appreciate receiving your response to this proposal by July 24, 2006.

(Pl. Michigan Diagnostics' Resp. to Def.'s Mot. to Dismiss Countercls. Ex. A. [hereinafter Def.'s Opp.].) This enclosure listed sixty-two patents: seven of the eight patents for which Applied Biosystems now brings infringement claims, and the fifty-five additional patents that are referred to in the counterclaim. Counsel for Michigan Diagnostics responded on August 16, 2006:

We have now completed a review of approximately one-half of the patent portfolio which you were kind enough to send to us. As I had suggested during our initial telephone conversation, there does not appear to be an issue of infringement.

The composition which Michigan Diagnostic sells and distributes is outside the claims of any of the patents reviewed to date.

It appears that each of the Applied Biosystems reviewed patents are limited to a dioxetane where spiro-fused ring, where present, is "passive" or inactive. The Michigan Diagnostic dioxetane is not such a product. However, because of the proprietary nature of the composition, Michigan Diagnostic would only be willing to disclose this compound, to you, to corroborate what is set forth herein, on a confidential basis.

If you are so inclined, then we will provide the structure to you.

Further, as you indicated to me, you had not, as of the time we discussed the situation, determined or had any knowledge of the actual Michigan Diagnostic composition, only that it was a competitive product in the marketplace.

Michigan Diagnostic is not seeking litigation nor does it want to engage in the same but, based upon our analysis, there simply does not appear to be any question of infringement at this time, with respect to the patents that have been reviewed to date.

(*Id.* Ex. B.) Applied Biosystems' counsel replied on August 31, 2006:

We are currently reviewing your comments with respect to the composition of the products that Michigan Diagnostics sells and we are considering your offer to provide us with details of the structure of these compounds. In the meantime, please advise when you will have completed your review of the remainder of the patents.

Finally, I would like to clarify the statements in the penultimate paragraph of the first page of your letter. While it is true that I personally have not conducted a determination of the actual Michigan Diagnostics composition, this should not be construed to infer or imply that Applied Biosystems has not conducted an evaluation. In fact, Applied Biosystems has conducted an evaluation of the Michigan Diagnostics products.

(*Id.* Ex. C.) Counsel for Michigan Diagnostics responded on September 15, 2006:

. . . . As I have previously indicated, as soon as the balance of the patents are analyzed, we will supplement our position. However, the next to last sentence of your letter seems to indicate the Applied Biosystems has conducted an evaluation of the compositions of Michigan

Diagnostics. Obviously, you may have a different view from that of my client and myself and it would certainly be most beneficial if you could provide us with your evaluation to see where, if any, there is disagreement between us. This would quite clearly facilitate the resolution of any potential problem.

(*Id.* Ex. D.) Counsel for Michigan Diagnostics wrote to the Senior Director of Licensing at Applied Biosystems on December 5, 2006:

I had previously asked [Applied Biosystems' counsel] to identify which claims of which of your patents you believe the products of Michigan Diagnostic infringe. Once we know this, we can certainly be in a better position to evaluate your position. To suggest that Michigan Diagnostic products infringe all the claims of each patent seems untenable.

(*Id.* Ex. E.) On March 26, 2007, Applied Biosystems filed its first complaint in the present action.

The communications between the parties have not created a case or controversy as to whether the fifty-five additional Applied Biosystems patents not sued upon are infringed by Michigan Diagnostics. Michigan Diagnostics' previously quoted characterization of its interactions with Applied Biosystems as "[m]inor dialogue" is a fair one. (*See* Ans. and Countercls. 8 ¶ 11) There is no "definite and concrete" dispute as to particular patents, except the seven patents as to which Applied Biosystems alleges infringement in its second amended complaint. *See MedImmune, Id.* at 127, 127 S.Ct. 764 (quoting *Aetna*, 300 U.S. at 240, 57 S.Ct. 461). The correspondence between the parties itself bespeaks the lack of any specific dispute: "it would certainly be most beneficial if you could provide us with your evaluation to see where, if any, there is disagreement between us. This would quite clearly facilitate the reso-

lution of any potential problem," (*see* Def.'s Opp. Ex. C.); "Once we know [which claims of which patents Applied Biosystems believes are infringed], we can certainly be in a better position to evaluate your position." (*see id.* Ex. D.)

Precisely. The "problem that arises when the other side does not sue," *see Sony*, 497 F.3d at 1284, is not a problem, or at least not the same problem, when the other side has not made any particularized suggestion of infringement and may *never* sue. Applied Biosystems broadly, and with some palpable bravura, suggested a review of its entire patent portfolio, but it did not make any specific allegations of infringement except within its pleading in this lawsuit. Nor has Michigan Diagnostics, after apparently conducting a review of Applied Biosystems' patents, argued that it might be infringing on any of these patents but for their invalidity. In short, it is far from clear that any dispute actually exists as to the fifty-five patents. As to them it may be fairly said that Michigan Diagnostics is essentially seeking an advisory opinion. There is no jurisdiction for that essay.

Accordingly, Michigan Diagnostics' counterclaim for a declaration of non-infringement must be dismissed for lack of subject matter jurisdiction as to the fifty-five patents not the subject of the infringement claims set forth in the second amended complaint because no case or controversy as to those fifty-five patents presently exists under Article III and the DJA.

*B. Counterclaim for Unfair Competition Under the Lanham Act*

■ Michigan Diagnostics alleges that Applied Biosystems, "knowing that its patents are either invalid ... or that Michigan Diagnostics' compositions do not infringe ... has undertaken the predatory practice of driving Michigan Diagnostics

out of business by causing Michigan Diagnostics to defend against baseless patent infringement claims," (Ans. and Countercls. 11 ¶ 29), that it "has undertaken this predatory practice of suing in order to maintain its monopoly position in the chemiluminescent chemical market by means other than competition on the merits," (*Id.* ¶ 30), and that "[u]pon information and belief, [Applied Biosystems] has undertaken this course of conduct deliberately to impede Michigan Diagnostics' efforts to sell its chemical by using the internet to advise potential customers that Michigan Diagnostics is infringing [Applied Biosystems'] patents." (*Id.* at 12 ¶ 31.) It avers that the alleged actions by Applied Biosystems constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Applied Biosystems moves to dismiss this counterclaim because it fails to state a claim upon which relief can be granted and dismissal is appropriate under Rule 12(b)(6).

Section 43(a) of the Lanham Act provides, in relevant part:

(1) Any person who, on or in connection with any goods or services … uses in commerce any … false or misleading description of fact, or false or misleading representation of fact, which—

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a)(1).

 "[T]he protection otherwise afforded by the patent laws to a patentee's conduct in enforcing its patent may be lost if the patentee acts in bad faith." *Zenith*

*Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1343 (Fed.Cir.1999) However, a claim for patent infringement, without more, cannot be the basis for an unfair competition claim under Section 43(a) of the Lanham Act. *See id.* at 1344, 1349. "[T]here is no legal basis for a holding that inequitable conduct, or the assertion of a patent procured through inequitable conduct, constitutes unfair competition." *Pro–Mold & Tool Co., Inc. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1575 (Fed.Cir.1996). Accordingly, to the extent the counterclaim is based on nothing more that Applied Biosystems' assertion of infringement claims, it fails to state a claim upon which relief under Section 43(a) can be granted.

Michigan Diagnostics argues, however, that the "gravamen" of its claim is marketplace activity, not the abuse of the administrative or judicial process. (Def.'s Opp. 10.); *see Zenith*, 182 F.3d at 1349. "[T]he initiation of an infringement suit is clearly not covered by the text of § 43(a), while a communication to the customers of the accused infringer, in certain instances, may be." *Zenith*, 182 F.3d at 1349. While a patentee's statements as to its patent rights are conditionally privileged, they may be actionable if made in bad faith. *Zenith*, 182 F.3d at 1353. To harmonize this tension between patent law and the Lanham Act, the Federal Circuit held in *Zenith* that "before a patentee may be held liable under § 43(a) for marketplace activity in support of its patent, and thus be deprived of the right to make statements about potential infringement of its patent, the marketplace activity must have been undertaken in bad faith." *Id.*

The unfair competition counterclaim does not adequately allege bad faith. It broadly asserts that when it brought its infringement suit and announced it to the market, Applied Biosystems knew its patents were invalid or that Michigan Diag-

nostics' products did not infringe the patents. Such a conclusory allegation of guilty knowledge is not sufficient as a matter of pleading. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007) ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."). Moreover, it would disturb the balance the *Zenith* court attempted to strike between the cause of action authorized under Section 43(a) of the Lanham Act and the enforcement of rights granted under patent law if a party were to be permitted to plead an unfair competition counterclaim merely by means of a broad allegation that the patentee "knew" it had no right to enforce its patent. *See Zenith,* 182 F.3d at 1352 ("[A] conflict seemingly arises when an accused infringer attempts to use 'the long reach of antitrust law' to frustrate an honest patentee's right to enforce a patent.") (quoting *Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986, 996 (9th Cir.1979)). Pleading knowledge of non-infringement or invalidity in broad conclusory terms without specifics would enable an accused infringer to add a Lanham Act claim to almost every case. To forestall that eventuality, *Zenith* requires an allegation of bad faith. *Id.* at 1353. *Twombly* requires this allegation to include "enough facts to state a claim to relief that is plausible on its face," such that the claim crosses "the line from conceivable to plausible." *See Twombly,* 127 S.Ct. at 1974.

In *Zenith,* the unfair competition claim asserted facts which, taken as true, would support a conclusion of bad faith. It was alleged that the purportedly infringing products used a specific touch-screen technology that was different from the specific touch-screen technology disclosed in the patents. *Zenith,* 182 F.3d at 1343. The

impossibility of infringement thus had to have been obvious to the patentee, and any representation to the contrary had to have been knowingly false and thus made in bad faith. *See id.* There are no similar specifics in Michigan Diagnostics' allegations. Although one of the letters attached to Michigan Diagnostics' brief in opposition to the motion to dismiss provides this type of information at a very general level, (*see* Def.'s Opp. Ex. B ("It appears that each of the Applied Biosystems reviewed patents are limited to a dioxetane where spiro-fused ring, where present, is "passive" or inactive. The Michigan Diagnostic dioxetane is not such a product.")), similar allegations are not made in the counterclaim.

What the counterclaim alleges is that, as a result of both prior collaboration and prior litigation between the present parties and their respective predecessors, "the technology and patents involved herein are based in whole or in part on Dr. Giri's invention(s), the knowledge of which [Applied Biosystems] had possessed." (Ans. and Countercls. 8 ¶ 9.) No details. No reference to any claims in any patent. No description of any particular product. The fact that Applied Biosystems' patents are "based on" earlier work is as consistent with their validity as with their invalidity. A patented invention can be "based on" prior work and yet still include novel, non-obvious advances or refinements. The vague allegations in this case are a far cry from the specific allegations found sufficient in *Zenith.* They are insufficient to plausibly plead that Applied Biosystems acted in bad faith in communicating to the market its assertions about infringement by Michigan Diagnostics.

 More fundamentally, the unfair competition counterclaim does not allege the necessary elements of a claim under § 43(a) of the Lanham Act. *See* 15 U.S.C.

§ 1125(a)(1). In addition to alleging facts supporting bad faith, a plaintiff must allege "(1) that the defendant ... made a false or misleading statement of fact in commercial advertising or promotion about the plaintiff's goods or services; (2) that the statement actually deceives or is likely to deceive a substantial segment of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the defendant caused the statement to enter interstate commerce; and (5) that the statement results in actual or probable injury to the plaintiffs." *Zenith*, 182 F.3d at 1348, 1353. Review of the counterclaim reveals that at least the second, third, and fifth necessary elements are omitted.

Michigan Diagnostics' counterclaim for unfair competition therefore must be dismissed pursuant to Rule 12(b)(6) for failing to state a claim upon which relief can be granted.

### C. Counterclaim for Walker Process Fraud

■ A patent is an exception to the general rule against monopolies, but one who obtains a patent by knowingly and willfully misrepresenting facts to the PTO can be stripped of the exemption from antitrust regulation. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). "[T]he enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present." *Id.* at 174, 86 S.Ct. 347.

■ A *Walker Process* fraud allegation is subject to the heightened pleading requirements of Rule 9(b). *Medimmune, Inc. v. Genentech, Inc.*, 427 F.3d 958, 967 (Fed.Cir.2005), *rev'd on other grounds*, 546 U.S. 1169, 126 S.Ct. 1329, 164 L.Ed.2d 46 (2006). "In alleging fraud ... a party must state with particularity the circumstances constituting fraud...." Fed. R.Civ.P. 9(b). Michigan Diagnostics fails to plead its *Walker Process* fraud counterclaim with adequate factual particularity. It alleges that Applied Biosystems intentionally deceived the Patent and Trademark Office ("PTO"), and thus obtained its patents, by not informing the PTO "of its knowledge of Dr. Giri's inventions which were substantially incorporated into many of the [Applied Biosystems] patents." (Ans. and Countercls. 12 ¶ 33.) But it does not identify which of the many Applied Biosystems patents were obtained in this manner, which inventions by Dr. Giri were incorporated, nor what disclosures should have been made.

Michigan Diagnostics offers only the circular explanation that the counterclaims pertain to "those patents which "were invented by Dr. Giri while employed at Wayne State University" and 'inventions that the named inventor derived from Dr. Giri's work.'" (Def.'s Opp. 15 (citing Ans. ¶¶ 19–20).) This is plainly insufficient; there is a total absence of particularity.

The counterclaim for *Walker Process* fraud is therefore dismissed pursuant to Rules 12(b)(6) and 9(b).

### D. Patent Misuse

■ Michigan Diagnostics also counterclaims for "patent misuse." Similar to its *Walker Process* fraud counterclaim, in this counterclaim it alleges that many of Applied Biosystems' patents are invalid and unenforceable by reason of their being obtained through fraud and/or inequitable conduct before the PTO. Inequitable conduct, like fraud, has to be pled with particularity. *See* Fed.R.Civ.P. 9(b); *Cent. Admixture Pharm. Servs., Inc. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347, 1356 (Fed.Cir.2007). Michigan Diagnos-

tics specifies neither the particular patents that it believes were obtained through fraud or inequitable conduct, nor the prior art invented by Dr. Giri that should have been disclosed to the PTO. It therefore has failed to state a claim upon which relief can be granted, and the counterclaim for patent misuse must be dismissed pursuant to Rules 12(b)(6) and 9(b).

## IV. Conclusion

For all the foregoing reasons, the plaintiff's Motion for Leave to File Second Amended Complaint (dkt. no. 66) and its Motion to Dismiss Defendant's Counterclaims (dkt. no. 28) are both GRANTED. The defendant's counterclaims are dismissed with the exception of Count I (the counterclaim for non-infringement) insofar as it seeks a declaratory judgment regarding the patents in suit under the second amended complaint.

It is SO ORDERED.