CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE
*965 I. INTRODUCTION
Plaintiff ChromaDex, Inc. ("ChromaDex"), brings this action for breach of contract, fraudulent deceit, misappropriation of trade secrets in violation of California Civil Code §§ 3426 et seq. , and misappropriation of trade secrets in violation of 18 U.S.C. § 1836 against Defendant Elysium Health, Inc. ("Elysium"). (See generally Dkt. 26 [First Amended Complaint, hereinafter "FAC"].) Elysium counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, declaratory judgment of patent misuse, and unlawful and unfair business practices in violation of California's Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200 et seq . (Dkt. 31 [First Amended Counterclaims, hereinafter "CC"].) Before the Court is Elysium's motion to dismiss ChromaDex's fourth, fifth, and sixth amended claims, (Dkt. 30), and ChromaDex's motion to dismiss Elysium's third, fourth, and fifth amended counterclaims, (Dkt. 34). For the following reasons, Elysium's motion is GRANTED IN SUBSTANTIAL PART and ChromaDex's motion is GRANTED IN PART.[1]
II. BACKGROUND
"ChromaDex is Elysium's sole supplier of the two active ingredients in Elysium's only product: a dietary supplement named 'Basis.' Specifically, ChromaDex supplies Elysium with NIAGEN®, a patented, proprietary health ingredient that is comprised of nicotinamide riboside ('NR'), and pTeroPure®, a patented, proprietary health ingredient made of pterostilbene, in return for product payments and sales royalties for NIAGEN." (FAC ¶ 2.) ChromaDex is apparently the sole commercial supplier of NR. ( CC ¶ 4.) Elysium began discussions with ChromaDex to obtain a supply of NR in the summer of 2013. (Id. ¶ 42.) Elysium expressed concern regarding ChromaDex's "onerous" terms, such as "upfront cash payments, minimum purchase commitments, royalties and even equity positions from businesses seeking to use ChromaDex as a source for the supply of [NR]." (Id. ¶ 43.) After negotiating and exchanging draft agreements in November and December 2013, (id. ¶¶ 43-54), the parties entered into a NIAGEN (NR) Supply Agreement on February 3, 2014, a Trademark License and Royalty Agreement on February 3, 2014, and a pTeroPure (pterostilbene) Supply Agreement on June 26, 2014. (FAC ¶¶ 16-18; id. Exs. A-D.)
According to ChromaDex, ChromaDex and Elysium's commercial arrangement was "expanding but unremarkable" prior to June 2016. (Id. ¶ 20.) Then, in the first quarter of 2016, Elysium ordered nearly double the amount of NIAGEN it had ordered in all of 2015, and in the second quarter of 2016, Elysium first raised concerns about pricing under the NIAGEN Supply Agreement. (Id. ¶¶ 20-21.) Elysium allegedly refused or ignored ChromaDex's offers to resolve its concerns, however. (Id. ¶ 21.) On June 28, 2016, "without any prior discussion or advance notification, Elysium submitted two extraordinarily large purchase orders for NIAGEN and pTeroPure."
*966 (Id. ¶ 22.) These orders were approximately four times larger than any previous orders and more than double the sum of all Elysium's prior orders. (Id. ) They also included a demand for two products at less than half of the previously agreed upon price. (Id. )
ChromaDex set up a call with Elysium about the price of these orders on June 30, 2016, and Elysium allegedly stated that because it was "ramping up," Elysium expected to use all of its ordered products over the next few months and would place additional large orders in the third and fourth quarters of 2016. (Id. ¶¶ 24-27.) Based on this representation, ChromaDex offered Elysium a discounted price for NIAGEN, which Elysium was "not entirely satisfied with" but accepted. (Id. ¶¶ 27-29.) ChromaDex alleges that Elysium "intended to induce ChromaDex to inadvertently supply large amounts of NIAGEN and pTeroPure to Elysium at grossly discounted prices." (Id. ¶ 23.) ChromaDex filled the orders on July 1 and August 9, 2016, and sent Elysium invoices totaling $2,983,350. (Id. ¶¶ 30-31.)
On August 10, 2016, however, Elysium informed ChromaDex that it would not pay the past due invoices until other concerns raised on the June 30, 2016, call were resolved according to Elysium's terms. (Id. ¶ 34.) Elysium has allegedly refused to pay the amount due or engage in discussions about a resolution. (Id. ¶ 38.) Elysium apparently has not ramped up its business or placed additional orders with ChromaDex as promised. (Id. ¶ 42.) ChromaDex further alleges that Elysium's false promises were motivated by the fact that it "was seeking financing during the middle of 2016 and at least into November 2016, [and] has been able to improve its balance sheet by continuing to sell its product for millions of dollars in revenue without paying ChromaDex a dime for the supply, likely engaging in fictional book keeping and deceiving potential or actual investors about Elysium's financial condition." (Id. ¶ 43.)
Accordingly, Elysium has allegedly breached the pTeroPure Supply Agreement by failing to pay 30% of the amount due within 30 days of the date of the invoices and the remainder within 60 days of the date of the invoices, and it has allegedly breached the NIAGEN Supply Agreement by failing to pay the amount due within 30 days of the invoice. (Id. ¶¶ 45-56.) Under the terms of the Royalty Agreement, Elysium has also breached its obligation to pay royalties to ChromaDex based on its net sales of its product containing NIAGEN and to furnish quarterly reports detailing such royalties. (Id. ¶¶ 57-67.) ChromaDex estimates these royalties will amount to no less than $1 million. (Id. ¶ 67.)
Elysium also allegedly conspired with two ChromaDex employees, Mark Morris (Vice President of Business Development) and Ryan Dellinger (Director of Scientific Affairs), to steal ChromaDex's "confidential and proprietary information" to injure ChromaDex for Elysium's benefit. (Id. ¶¶ 68-72.) Morris allegedly informed Elysium of ChromaDex's "confidential business dealings and information ChromaDex had acquired about one or more potential partners" on or around April 28, 2016. (Id. ¶ 73.) "On or around May 25, 2016, Morris made an unusual request for the contact information for one of ChromaDex's research partners from Dellinger, which Dellinger provided. Less than a month later, on or around June 24, 2016, Dellinger was contacted by that ChromaDex partner, who informed him that he had been contacted by Elysium. Dellinger encouraged that ChromaDex partner to talk with Elysium and did not inform anyone at ChromaDex about Elysium's activity." (Id. ¶ 74.) Morris resigned from ChromaDex on *967 July 16, 2016, and shortly thereafter joined Elysium. (Id. ¶ 75.) Dellinger resigned from ChromaDex the same day Elysium notified ChromaDex that it would not pay the past due invoices (August 10, 2016), and joined Elysium soon after. (Id. ¶ 76.) ChromaDex alleges that Morris and Dellinger disclosed additional proprietary and confidential business information, but the full extent is not now known and "can only be uncovered through discovery." (Id. ¶ 77.)
Based on these allegations, ChromaDex brings claims for breach of the pTeroPure supply agreement, breach of the NIAGEN supply agreement, breach of the Royalty agreement, fraudulent deceit, and misappropriation of trade secrets under both state and federal law. (Id. ¶¶ 79-121.)
Elysium's counterclaims, in turn, stem from its allegations that "ChromaDex has committed patent misuse and engaged in unfair competition by leveraging its market power in the supply of [NR] to impose conditions on its customers that impermissibly broaden the scope of the patent grant with anticompetitive effect." ( CC ¶ 6.) ChromaDex's market power apparently comes from, among other things, patents it has in-licensed relating to NR, including U.S. Patent Nos. 8,383,086 ("the '086 patent"), 8,197,807 ("the '807 patent"), 8,106,184 ("the '184 patent"), 8,114,626 ("the '626 patent"), and 7,776,326 ("the '326 patent"), which are assigned to third parties and exclusively licensed to ChromaDex. (Id. ¶¶ 32, 35-36.)
Elysium alleges that ChromaDex has conditioned its sale of NIAGEN on purchasers' agreement to license ChromaDex trademarks and pay substantial royalties as a result. (Id. ¶ 6.) Elysium claims that ChromaDex conditioned the execution of the NIAGEN Supply Agreement on Elysium's simultaneous execution of the License and Royalty Agreement, "which forces Elysium to pay a substantial royalty to ChromaDex on all Elysium products containing ingredients supplied by ChromaDex under the [NIAGEN] Supply Agreement, even if Elysium does not use, and does not want to use, any ChromaDex marks." (Id. ) "Not only is the royalty obligation unconnected to use of ChromaDex's trademarks, but the royalty rate also changes for reasons unrelated to use of any trademarks. Instead, for example, the royalty rate increases as Elysium's annual worldwide net sales of products containing ingredients supplied by ChromaDex increases," which provides "additional means for ChromaDex to protect its market power in [NR], unlawfully extend ChromaDex's patent monopoly, and adversely affect competition." (Id. ¶¶ 57, 59.)
Elysium claims that to induce Elysium to sign the License and Royalty agreement, ChromaDex falsely insisted that all of its NR customers must sign similar agreements. (Id. ¶ 7.) "In reliance on ChromaDex's false representation that it required all of its customers to execute trademark license and royalty agreements, Elysium concluded that the issue was non-negotiable, and instead focused its efforts on negotiating the other provisions of the [NIAGEN] Supply Agreement." (Id. ¶ 51.)
Elysium contends that ChromaDex also breached the NIAGEN Supply Agreement, under which Elysium is "entitled to receive pricing on [NR] that is at least as favorable as the price at which ChromaDex supplies [NR] or a substantially similar product to other purchasers, but never more than a certain maximum price" (the "MFN Provision"). (Id. ¶ 8.) On June 13, 2016, in response to a request from Elysium for information regarding ChromaDex's compliance with the MFN Provision, ChromaDex allegedly provided Elysium with a "manipulated and misleading Excel spreadsheet" which purported to "list the prices at which ChromaDex was selling *968 [NR] to purchasers other than Elysium under various supply agreements." (Id. ¶ 12.) The spreadsheet was supposed to omit the identity of ChromaDex's other customers, but inadvertently included two tabs containing "unblinded" sheets, which listed additional customers that ChromaDex omitted from the "blinded" sheets, and purportedly showed that ChromaDex had agreed to sell NR to other purchasers at a price more favorable than the price given to Elysium. (Id. ¶ 13.) "On a June 30, 2016 phone call with two of Elysium's co-founders, Eric Marcotulli and Dan Alminana, [ChromaDex's CEO, Frank Jaksch] confirmed that other purchasers of [NR] had been paying a price substantially lower than Elysium had been paying, in violation of the MFN Provision." (Id. ¶ 14.) The spreadsheet also apparently revealed that not all ChromaDex customers were required to sign license and royalty agreements. (Id. ) "[A]t least one of these customers, in ChromaDex's own words, 'pre-dates Elysium.' " (Id. ¶ 68.) For this reason, Elysium submitted purchase orders for 3000 kg of NR and 580 kg of pterostilbene on June 30, 2016, "with the understanding that ChromaDex would promptly issue a refund or credit to Elysium on account of ChromaDex's breach of the MFN Provision." (Id. ¶ 15.)
After submitting the June 30 Purchase Orders, Elysium discovered that other products containing both NR and pterostilbene or NR and resveratrol, a product substantially similar to pterostilbene, were being sold on the market by other ChromaDex customers. (Id. ¶ 16.) ChromaDex was apparently even "actively recommending to other customers that they create such products to compete with Elysium's Basis, in violation of the Exclusivity Provision" in the NIAGEN Supply Agreement. (Id. ¶ 17.)
As a result, Elysium has counterclaimed for breach of the NIAGEN Supply Agreement, breach of the covenant of good faith and fair dealing relating to the NIAGEN Supply Agreement, fraudulent inducement relating to the License and Royalty Agreement, declaratory judgment of patent misuse, and unlawful and unfair business practices in violation of the UCL. (Id. ¶¶ 89-122.)
III. LEGAL STANDARD
A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims asserted. Gilligan v. Jamco Dev. Corp. , 108 F.3d 246, 249 (9th Cir. 1997). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). When evaluating a Rule 12(b)(6) motion, the district court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. Moyo v. Gomez , 32 F.3d 1382, 1384 (9th Cir. 1994). The district court may also consider additional facts in materials of which the district court may take judicial notice, Barron v. Reich , 13 F.3d 1370, 1377 (9th Cir. 1994), as well as "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading," Branch v. Tunnell , 14 F.3d 449, 454 (9th Cir. 1994), overruled in part on other grounds by Galbraith v. Cty. of Santa Clara , 307 F.3d 1119 (9th Cir. 2002).
However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."
*969 Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ; see also Bell Atl. Corp. v. Twombly , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (stating that while a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, courts "are not bound to accept as true a legal conclusion couched as a factual allegation" (citations and quotations omitted) ). Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." Twombly , 550 U.S. at 570, 127 S.Ct. 1955. In keeping with this liberal pleading standard, the district court should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factual allegations. Doe v. United States , 58 F.3d 494, 497 (9th Cir. 1995).
IV. DISCUSSION
A. Motion to Dismiss Claims
Elysium moves to dismiss ChromaDex's fourth claim for fraudulent deceit and its fifth and sixth claims for misappropriation of trade secrets in violation of state and federal law. (Dkt. 30-1 at 2-3.)
1. Fraudulent Deceit
ChromaDex's fraudulent deceit claim is based on Elysium's alleged false promises and representations that (1) Elysium was ramping up its business and needed large volumes of NIAGEN and pTeroPure quickly, (2) Elysium would pay a discounted price for NIAGEN and work with ChromaDex to resolve Elysium's concerns about the NIAGEN Supply Agreement, and (3) Elysium emailed an estimate for royalties due with no intent to pay them, all "with the intent of inducing ChromaDex to provide [Elysium with unusually large supplies of NIAGEN and pTeroPure that would last it through any dispute with ChromaDex and which would also serve as leverage in any dispute." (FAC ¶¶ 94-100.) Elysium argues that this claim must be dismissed under the economic loss rule, (Dkt. 30-1 at 7), which generally bars tort claims based on contract breaches, and "requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise," Robinson Helicopter Co. v. Dana Corp. , 34 Cal.4th 979, 988, 22 Cal.Rptr.3d 352, 102 P.3d 268 (2004). The doctrine "is designed to maintain a distinction between damage remedies for breach of contract and for tort." UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc. , 117 F.Supp.3d 1092, 1103 (C.D. Cal. 2015). Elysium argues that "ChromaDex has simply repackaged its breach of contract claims as a tortious fraud claim," since the ChromaDex alleges that Elysium made false promises and representations to induce ChromaDex to perform obligations that it already had under the NIAGEN and pTeroPure Supply Agreements-to fulfill Elysium's NIAGEN and pTeroPure orders. (Dkt. 30-1 at 7-8.)
ChromaDex maintains that its claim falls within a "black letter law exception" to the economic loss rule articulated in Robinson Helicopter that "a contract is not a license allowing one party to cheat or defraud another." (Dkt. 37 at 9 (citing Robinson Helicopter , 34 Cal.4th at 992, 22 Cal.Rptr.3d 352, 102 P.3d 268 ).) However, Robinson Helicopter explained "[a] party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to that contract ." Robinson Helicopter , 34 Cal.4th at 993, 22 Cal.Rptr.3d 352, 102 P.3d 268 (emphasis added). In that case, a helicopter manufacturer sued a parts supplier who changed its manufacturing process, resulting in an increased failure rate, without notifying the plaintiff, and the defendant continued to provide false certificates with each delivery indicating that the parts met the plaintiff's written specifications.
*970 Id. at 985-88, 22 Cal.Rptr.3d 352, 102 P.3d 268. Robinson Helicopter also emphasized that its holding "is narrow in scope and limited to a defendant's affirmative misrepresentations on which a plaintiff relies and which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss." Id. at 993, 22 Cal.Rptr.3d 352, 102 P.3d 268 (emphasis added).
The Robinson Helicopter exception does not apply in this case. ChromaDex does not allege that Elysium's actions caused ChromaDex to face any independent liability to third parties. ChromaDex's injury is simply economic harm resulting from the contract-namely, that Elysium owes it money that Elysium will not pay. Nor did Elysium's alleged misrepresentations change any terms material to the contract, as was the case in Robinson Helicopter . Elysium's purported statements were simply reassurances and representations incidental to the contract to induce ChromaDex to fill orders that it was already obligated to fill under the agreements.
ChromaDex also cites Erlich v. Menezes , 21 Cal.4th 543, 552, 87 Cal.Rptr.2d 886, 981 P.2d 978 (1999), for the proposition that "tort damages may accompany contract claims when 'the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm.' " (Dkt. 37 at 9, 11.) Erlich is similarly unhelpful, since it specified scenarios when the aforementioned exception applies, none of which apply here: "where a breach of duty directly causes physical injury; for breach of the covenant of good faith and fair dealing in insurance contracts; for wrongful discharge in violation of fundamental public policy; or where the contract was fraudulently induced." Robinson Helicopter , 34 Cal.4th at 989-90, 22 Cal.Rptr.3d 352, 102 P.3d 268 (citing Erlich , 21 Cal.4th at 551-52, 87 Cal.Rptr.2d 886, 981 P.2d 978 ) (internal modifications omitted). Robinson Helicopter explained that outside these four instances or the insurance context, " 'a tortious breach of contract ... may be found when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion; or (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages.' " Id. at 990, 22 Cal.Rptr.3d 352, 102 P.3d 268 (quoting Erlich , 21 Cal.4th at 553-54, 87 Cal.Rptr.2d 886, 981 P.2d 978 ). Since the requirements of the exception laid out in Robinson Helicopter are not met, ChromaDex's fraudulent deceit claim is barred by the economic loss rule which cannot possibly be cured through amendment; the claim is accordingly DISMISSED WITHOUT LEAVE TO AMEND.[2]
2. Misappropriation of Trade Secrets
Elysium argues that ChromaDex has failed to allege the existence of a protectable trade secret, which is necessary for its trade secret misappropriation claims under the California Trade Secrets Act ("CUTSA") and the federal Defend Trade Secrets Act ("DTSA"). (Dkt. 30-1 at 10.) " 'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to *971 other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d) (CUTSA) ; see also 18 U.S.C. § 1839(3) (providing a substantially similar definition under the DTSA). Elysium contends that the following descriptions of trade secrets in the FAC are insufficient, (id. at 11): "confidential business dealings and information ChromaDex had acquired about one or more potential partners," (FAC ¶ 73); "contact information for one of ChromaDex's research partners," (id. ¶ 74); "the identity of potential customers and collaborators, knowledge of those customers, and the contact information of one or more partners of ChromaDex," (id. ¶ 111); and "the identity and contact information of ChromaDex's partners, clinical study designs, clinical safety reports, and clinical study data," (id. ¶ 112). Specifically, Elysium argues that ChromaDex has not alleged protectable subject matter because it has not provided "facts establishing that the information and methods alleged to constitute its trade secrets derive independent economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure." (Dkt. 30-1 at 14-15 (emphasis in original) (quoting Webpass Inc. v. Banth , No. C14-02291 HRL, 2014 WL 7206695, at *3 (N.D. Cal. Dec. 18, 2014) ).)
The FAC alleges that the purported trade secrets "have tremendous economic value from not being generally known in that their use has resulted and continues to result in retention and renewal of existing accounts and customers as well as referrals to other potential customers and accounts." (FAC ¶ 106.) ChromaDex further alleges that it undertook the following "reasonable efforts to ensure that its trade secret information remains secret by, among other things: (1) informing its employees of the restricted and prohibited use of the information and that it constitutes a trade secret; (2) making its employees with access to such information party to confidentiality agreements as conditions of their employment with ChromaDex; (3) [ ] restricting access to its trade secret information to only employees who have executed its confidentiality agreement and acknowledged and agreed to keep ChromaDex's trade secrets secret; and (4) employing policies restricting the dissemination and use of its proprietary information." (Id. ¶ 107.)
However, "courts are reluctant to protect customer lists to the extent they embody information which is 'readily ascertainable' through public sources, such as business directories." Morlife, Inc. v. Perry , 56 Cal.App.4th 1514, 1521, 66 Cal.Rptr.2d 731 (1997). "[W]here the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market," but "[s]uch lists are to be distinguished from mere identities and locations of customers where anyone could easily identify the entities as potential customers." Id. (emphasis added). ChromaDex has not alleged sufficient facts to demonstrate that the contact information of its potential customers and partners is not readily ascertainable through public sources-it simply alleges in a conclusory fashion that they are not generally known. Since this claim could possibly be cured through additional factual allegations if ChromaDex in good faith believes it can satisfy the requirements laid out in Morlife , ChromaDex's misappropriation of trade secret claims must be DISMISSED WITH LEAVE TO AMEND.[3]
*972 B. Motion to Dismiss Counterclaims
ChromaDex moves to dismiss Elysium's third counterclaim for fraudulent inducement, fourth counterclaim for patent misuse, and fifth counterclaim under the UCL. (Dkt. 34-1 at 1.)
1. Fraudulent Inducement
ChromaDex argues that Elysium's fraudulent inducement claim fails under Federal Rule of Civil Procedure 9(b) because Elysium has not alleged facts demonstrating that Jaksch's representation that all of ChromaDex's customers who signed purchase agreements to obtain NR were also required to sign separate trademark license and royalty agreements was false when made . (Dkt. 34-1 at 7-8 (citing In re Stac Elecs. Sec. Litig. , 89 F.3d 1399, 1404 (9th Cir. 1996) ).) Apart from describing direct evidence of fraud, a plaintiff "may also satisfy Rule 9(b) with allegations of circumstantial evidence if the circumstantial evidence alleged explains how and why the statement was misleading when made." Fecht v. Price Co. , 70 F.3d 1078, 1083 (9th Cir. 1995).
ChromaDex argues that "Elysium relies only on a spreadsheet purportedly containing a contradictory statement that it received two and a half years after the alleged false statement." (Id. at 8 (emphasis in original).) Elysium counters that the allegations concerning the spreadsheet demonstrate that Jaksch's statement was false when made because it showed that at least one NR purchaser whose relationship with ChromaDex pre-dated Elysium's was not required to sign license and royalty agreement or pay royalties. (Dkt. 38 at 12; CC ¶ 65 - 69.) Elysium also alleged that Jaksch knew his statement was false, made it to induce Elysium to enter into the License and Royalty Agreement, (CC ¶¶ 107, 109), and that, when pressed for an explanation about the spreadsheet, Jaksch conceded in an email the next day that at least one ChromaDex customer had paid less per kilogram for NR than Elysium had paid and that this customer did not have a royalty agreement in place, (id. ¶ 70). Viewing such allegations light most favorable to Elysium, they support a plausible inference that Jaksch's statements were fraudulent when made.
ChromaDex also argues that Elysium fails to plead reliance with particularity. (Dkt. 34-1 at 9.) ChromaDex contends that the counterclaims preclude Elysium from plausibly alleging reliance because they demonstrate that "[n]egotiations regarding the NIAGEN Supply Agreement were protracted, beginning in 12 August 2013-four months before the alleged misrepresentation-and not concluded until early 2014," during which time "Elysium successfully rebuffed ChromaDex's request for equity, negotiated a favorable preferred pricing MFN provision, obtained a form of exclusivity, and secured other negotiation 'wins' in the parties' robust negotiation." (Id. at 9-10 (citing CC ¶¶ 43, 53 ).) ChromaDex contends that "Elysium does not allege that it would not have entered [into] the agreement but for the alleged false statement, or even that it would have been able to negotiate a deal that did not contain a royalty payment." (Dkt. 34-1 at 10.)
However, for purposes of reliance under California law, Elysium need only allege that it would have behaved differently had it known the truth. Peel v. BrooksAmerica Mortg. Corp ., 788 F.Supp.2d 1149, 1162 (C.D. Cal. 2011) (relying on Mirkin v. Wasserman , 5 Cal. 4th 1082, 23 Cal.Rptr.2d 101, 858 P.2d 568 (1993) ). Elysium clearly alleges that after Jaksch's alleged misrepresentation it "concluded that the issue was non-negotiable" and that, "in view of ChromaDex's false claim that it *973 required an agreement of this nature from each and every one of its customers," Elysium "forewent the opportunity to negotiate an agreement with ChromaDex that did not require the payment of royalties." ( CC ¶¶ 51, 108.) These allegations plausibly state that Elysium would have acted differently if ChromaDex had not made the representation. That the parties engaged in "robust" negotiations before and after the alleged misrepresentation does not preclude Elysium from alleging that it was ChromaDex's misrepresentation that caused Elysium to stop attempting to negotiate the royalty and license issue. Elysium also alleges that this misrepresentation directly caused its damages, since it would not have otherwise entered into the License and Royalty Agreement. (Id. ¶¶ 108-10.) To the extent ChromaDex contends that Elysium did not in fact rely on the misrepresentation because it would have had no choice if it wanted to procure NR from the only available supplier (ChromaDex), this argument improperly asks Court to wade into the merits of Elysium's claims. Accordingly, Elysium has stated a counterclaim for fraudulent inducement.
2. Patent Misuse
ChromaDex argues that Elysium's fourth counterclaim for declaratory judgment of patent misuse arising from ChromaDex's alleged "tying of access to its patent rights to a royalty-bearing trademark license [which] impermissibly broadens the scope of those patent rights, with anticompetitive effect," is only an equitable defense, not an affirmative claim. (Dkt. 34-1 at 11 (citing CC ¶¶ 38, 113).) In response to Elysium's citing of case law demonstrating that a declaratory relief claim for patent misuse is permissible,[4] ChromaDex contends that patent misuse is not a cognizable claim in the absence of a patent infringement assertion, since a patent misuse claim is available only "as an equitable defense to an infringement action." (Dkt. 39 at 7-8 (citing Inamed Corp. v. Kuzmak , 275 F.Supp.2d 1100, 1124 (C.D. Cal. 2002) ).)
Elysium responds that "[a]ll that courts require for a declaratory judgment claim is the existence of a case or controversy." (Dkt. 38 at 14.) In MedImmune, Inc. v. Genentech, Inc. , 549 U.S. 118, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007), the Supreme Court held that "the question in each case [for declaratory relief] is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Id. at 127, 127 S.Ct. 764. A case or controversy exists here because ChromaDex seeks to enforce the royalty requirement in the parties' Agreement, and Elysium contends that the royalty requirement is unenforceable due to patent misuse. See Zenith Radio Corp. v. Hazeltine Research, Inc. , 395 U.S. 100, 139, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) ("We also think patent misuse inheres in a patentee's insistence on a percentage-of-sales royalty, regardless of use, and his rejection of licensee proposals to pay only for actual use. Unquestionably, a licensee must pay if he uses the patent. Equally, however, he may insist upon paying only for use, and not on the basis of total sales, including products *974 in which he may use a competing patent or in which no patented ideas are used at all. There is nothing in the right granted the patentee to keep others from using, selling, or manufacturing his invention which empowers him to insist on payment not only for use but also for producing products which do not employ his discoveries at all."). That ChromaDex has not threatened Elysium with patent infringement is immaterial. See, e.g. , Miotox LLC v. Allergan, Inc. , No. 2:14-CV-08723-ODW, 2015 WL 2084493, at *7 (C.D. Cal. May 5, 2015) ("Allergan has alleged that Miotox is seeking royalties on all sales of Botox for the treatment of migraine headaches even though the original '468 Patent has expired. The '468 Patent covered the broad treatment of migraine headaches using Botox. Miotox demands that Allergan pay the same royalties now, after the expiration of the '468 Patent, as it did previously, regardless of the scope of the New Patents, which are narrower. Under the patent misuse principles articulated in Zenith , the Court finds that Allergan has adequately stated a claim for relief." (internal citations omitted) ).
ChromaDex next argues that the patent misuse counterclaim fails because ChromaDex's alleged conduct-that it conditioned access to its products (through an implied license) on the purchase from ChromaDex of a trademark license-does not amount to an illegal tying arrangement. (Dkt. 34-1 at 12-13.) ChromaDex asserts that the trademark rights under the express terms of the Trademark License and Royalty Agreement are "wholly optional" and Elysium need not use the trademarks, but instead must pay royalties on products sales "to compensate ChromaDex for that portion of the product purchase price that Elysium claimed it could not afford to pay upfront, when it placed a purchase order." (Id. at 13.) This argument fails because Elysium does not complain that it was forced to use the licensed trademarks, only that it was forced to buy the license for the trademarks in order to have access to NR. ( CC ¶¶ 6, 48.) This is sufficient for a tying claim. Eastman Kodak Co. v. Image Tech. Servs. , 504 U.S. 451, 461-62, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (a tying arrangement is one where a party agrees "to sell one product but only on the condition that the buyer also purchases a different (or tied) product") (emphasis added).
Finally, ChromaDex argues that the tying allegations must fail because a trademark license is not a 'separate product' that can be tied to the patent rights, and "no tying arrangement can exist unless there is a sufficient demand for the purchase of [a trademark license for NIAGEN] separate from [the supply of NIAGEN] to identify a distinct product market in which it is efficient to offer [the trademark license] separately from [NIAGEN]." (Dkt. 34-1 at 14 (citing Jefferson Par. Hosp. Dist. No. 2 v. Hyde , 466 U.S. 2, 24-25, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc. , 547 U.S. 28, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006).) However, as Elysium points out, ChromaDex has conflated the test for product separability in the antitrust context with that in the patent misuse context. (Dkt. 38 at 17-18.) "The law of patent misuse in licensing need not look to consumer demand (which may be non-existent) but need look only to the nature of the claimed invention as the basis for determining whether a product is a necessary concomitant of the invention or an entirely separate product." Senza-Gel Corp. v. Seiffhart , 803 F.2d 661, 670 n.14 (Fed. Cir. 1986). The Court agrees that here, the patents, and the supply of NR, are entirely different products from ChromaDex's NIAGEN trademark, which Elysium does not use. "The NIAGEN mark is not essential to the sale, supply or use of NR; a *975 seller could call NR by many names, including different brand names or just the chemical name, using 'NR' or 'nicotinamide riboside' to describe the product." (Dkt. 38 at 18.) Accordingly, Elysium has stated a claim for declaratory relief of patent misuse.
3. UCL
ChromaDex argues that Elysium fails to adequately plead a violation of the UCL, (Dkt. 34-1 at 21-24), which is premised on three of ChromaDex's alleged acts: (1) "conditioning its supply of [NR] on the purchaser's agreement to license ChromaDex's trademarks," (CC ¶ 117); (2) "stepping up the royalty rates tied to its supply of [NR] as its patent and market power decreases," (id. ¶ 118); and (3) "breaches of the NR Supply, its active and deliberate concealment of those breaches from Elysium, and its attempt to defraud Elysium by its presentation to Elysium of the Fraudulent Spreadsheet," (id. ¶ 119). Elysium alleges that "ChromaDex has violated patent law and policy by committing patent misuse as a consequence of one or more of these acts or practices" and that "[t]hese acts or practices constitute unlawful and/or unfair acts or practices under California's state law of unfair competition." (Id. ¶¶ 120-21.)
In Linear Tech. Corp. v. Applied Materials, Inc. , 152 Cal.App.4th 115, 61 Cal.Rptr.3d 221 (2007), the California Court of Appeal explained that the UCL was enacted "to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." Id. at 135, 61 Cal.Rptr.3d 221. "Where a UCL action is based on contracts not involving either the public in general or individual consumers who are parties to the contract, a corporate plaintiff may not rely on the UCL for the relief it seeks." Id. Elysium contends that Linear nevertheless permits suits involving the public in general, and points out that its counterclaims allege harm to competition or plead an incipient violation of antitrust law through patent misuse. (Dkt. 38 at 24 (citing CC ¶¶ 120-21).) In Linear , however, the Court affirmed dismissal of the plaintiff's UCL claim because the alleged victims were "neither competitors nor powerless, unwary consumers," but rather were "corporate customers ..., 'each of which presumably has the resources to seek damages or other relief.' " Linear Tech. , 152 Cal.App.4th at 135, 61 Cal.Rptr.3d 221. In addition, "the source of the fraudulent and unfair practices [wa]s the misrepresentation made in purchase orders between respondent sellers and [the plaintiff]," so the harm suffered resulted directly from the corporate customers' contracts. Id. Here too, Elysium's relationship with ChromaDex "is defined by their contractual arrangement. The case does not involve the general public or individual consumers who are parties to a contract. Rather, it is a dispute between commercial parties over their economic relationship." In re ConocoPhillips Co. Serv. Station Rent Contract Litig. , No. M:09-CV-02040 RMW, 2011 WL 1399783, at *3 (N.D. Cal. Apr. 13, 2011). Even if ChromaDex's alleged unfair and unlawful acts reach other parties, those parties also appear to be corporate customers who similarly cannot obtain relief under the UCL. Accordingly, Elysium's UCL claim is DISMISSED WITHOUT LEAVE TO AMEND.
V. CONCLUSION
For the foregoing reasons, Defendant's motion to dismiss, (Dkt. 30), is GRANTED IN SUBSTANTIAL PART. Plaintiff's fourth claim for fraudulent deceit is DISMISSED WITHOUT LEAVE TO AMEND and its fifth and sixth claims for misappropriation of trade secrets in violation of state and federal law are DISMISSED WITH FOURTEEN DAYS'
*976 LEAVE TO AMEND. Plaintiff's motion to dismiss, (Dkt. 34), is GRANTED IN PART. Defendant's fifth counterclaim under the UCL is DISMISSED WITHOUT LEAVE TO AMEND.

Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. See Fed. R. Civ. P. 78 ; Local Rule 7-15. Accordingly, the hearing set for May 15, 2017, at 1:30 p.m. is hereby vacated and off calendar.

Since the Court finds that ChromaDex's claim is barred by the economic loss rule, it need not consider Elysium's arguments as to whether ChromaDex adequately pled justifiable reliance. (See Dkt. 30-1 at 9.)

Since the Court finds that ChromaDex has failed to allege the existence of a protectable trade secret, it need not consider Elysium's additional arguments as to whether these claims are sufficiently pled. (See Dkt. 30-1 at 11-21.)

See Dkt. 38 at 13-14 (relying on Inamed Corp. v. Kuzmak , 275 F.Supp.2d 1100, 1124 (C.D. Cal. 2002) ; B. Braun Med. Inc. v. Abbott Labs. , 124 F.3d 1419, 1428 (Fed. Cir. 1997) ; Glitsch, Inc. v. Koch Eng'g Co. , 216 F.3d 1382, 1386 (Fed. Cir. 2000) ; Linzer Prods. Corp. v. Sekar , 499 F.Supp.2d 540, 552-53 (S.D.N.Y. 2007) ; In re Gabapentin Patent Litig. , 649 F.Supp.2d 340, 349 (D.N.J. 2009) ; and Matsushita Elec. Indus. Co. v. CMC Magnetics Corp. , 2006 WL 3290413, 2006 U.S. Dist. LEXIS 101358 (N.D. Cal. Nov. 13, 2006).)