# United States Court of Appeals for the Federal Circuit

---

**BIOPARQUES DE OCCIDENTE, S.A. DE C.V., AGRICOLA LA PRIMAVERA, S.A. DE C.V., KALIROY FRESH LLC,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, FLORIDA TOMATO EXCHANGE,**
*Defendants-Appellees*

---

2020-2265, 2020-2266, 2020-2267

---

Appeals from the United States Court of International Trade in Nos. 1:19-cv-00204-JCG, 1:19-cv-00210-JCG, 1:20-cv-00035-JCG, Judge Jennifer Choe-Groves.

---

Decided: April 14, 2022

---

JEFFREY M. WINTON, Winton & Chapman PLLC, Washington, DC, argued for plaintiffs-appellants. Also represented by MICHAEL JOHN CHAPMAN, JOOYOUN JEONG, VI MAI. Also argued by JAMES P. DURLING, Curtis, Mallet-Prevost, Colt & Mosle LLP, Washington, DC; DEVIN S. SIKES, Akin Gump Strauss Hauer & Feld LLP, Washington, DC.

DOUGLAS GLENN EDELSCHICK, Commercial Litigation Branch, Civil Division, United States Department of

Justice, Washington, DC, argued for defendant-appellee United States. Also argued by ROBERT R. KIEPURA. Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, FRANKLIN E. WHITE, JR.; EMMA T. HUNTER, Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce, Washington, DC.

MARY JANE ALVES, Cassidy Levy Kent USA LLP, Washington, DC, argued for defendant-appellee The Florida Tomato Exchange. Also represented by JAMES R. CANNON, JR., ULRIKA K. SWANSON, JONATHAN M. ZIELINSKI.

————————————

Before DYK, PROST, and TARANTO, *Circuit Judges*.

TARANTO, *Circuit Judge*.

In 1996, the U.S. Department of Commerce initiated an investigation into whether fresh tomatoes from Mexico were being sold in the United States at less than fair value. After the International Trade Commission (ITC) made a preliminary determination of injury to a domestic industry from the sale of such tomatoes, Commerce made a preliminary determination that the tomatoes were being, or were likely to be, sold in the U.S. at less than fair value. On the day Commerce issued its preliminary dumping determination, exporters accounting for substantially all exports of fresh tomatoes from Mexico ("the Mexican parties") signed an agreement with Commerce to suspend the investigation. Pursuant to that 1996 Agreement, and 2002, 2008, and 2013 successor agreements, the signatories were required, among other things, to sell their products in the U.S. at minimum "reference" prices.

In the spring of 2019, Commerce withdrew from the 2013 Agreement, as authorized by its terms, and resumed the investigation. But the parties soon executed a new agreement (the 2019 Agreement), which suspended the

investigation, set higher minimum reference prices, required (generally speaking) that the dumping margin of each signatory's individual entries not exceed 15% of the dumping margin of its entries examined during the investigation, and provided for compliance reviews based on regular submissions of information from the Mexican parties. Shortly after the execution of the 2019 Agreement, however, domestic tomato producers asked Commerce to continue the investigation, which it did, as required by statute upon receipt of such requests. Commerce then reached a final determination that fresh tomatoes from Mexico were being, or were likely to be, sold in the U.S. at less than fair value, and it calculated estimated dumping margins, and the ITC made a final determination of material injury to a domestic industry. An antidumping duty order based on the final determination has not issued, however, because the 2019 Agreement remains in effect.

The present appeals arise from three complaints filed in the U.S. Court of International Trade (Trade Court or USCIT) challenging Commerce's termination of the 2013 Agreement, continuation of the investigation, and final determination. Each of the three complaints was filed jointly by the firms we will call "Bioparques" collectively—Bioparques de Occidente, S.A. de C.V. and Agricola La Primavera, S.A. de C.V., which are Mexican exporters of fresh tomatoes and signatories to the 2019 Agreement, and Kaliroy Fresh LLC, which is a U.S. importer of fresh tomatoes from Mexico. Each complaint asserted a different statutory basis of jurisdiction. The Trade Court dismissed all claims under USCIT Rule 12(b)(1) for want of the case or controversy required by Article III of the Constitution. It held that (a) Bioparques's claims regarding the termination of the 2013 Agreement became moot upon the execution of the 2019 Agreement and (b) Bioparques's claims regarding the final determination in the continued investigation were not ripe because Bioparques suffered no concrete injury until an antidumping duty order based on that

determination issued, which had not occurred and could not occur while the 2019 Agreement was in force. *Bioparques de Occidente, S.A. de C.V. v. United States*, 470 F. Supp. 3d 1366 (Ct. Int'l Trade 2020). Bioparques appeals.

We hold as follows. As to Bioparques's challenge to the termination of the 2013 Agreement, we rely on the opinion we issue today in *Confederacion de Asociaciones Agricolas del Estado de Sinaloa, A.C. v. United States*, No. 2020-2232 to conclude that Bioparques has stated no plausible challenge to that termination, so this challenge must be dismissed under USCIT Rule 12(b)(6). As to Bioparques's challenges to Commerce's final determination in the continued investigation (both the results and the process), we draw two conclusions. First, we conclude that this challenge presents a case or controversy that is justiciable under Article III of the U.S. Constitution. Second, we conclude that the Tariff Act of 1930 provides jurisdiction for the Trade Court to review the final determination at issue here even before an antidumping duty order has been published. We remand to the Trade Court to address the merits of Bioparques's claims regarding the final determination.

## I

### A

The Tariff Act of 1930 allows Commerce to initiate an investigation to determine whether imported merchandise is being sold in the U.S. at less than fair value (dumped). Tariff Act of 1930, Pub. L. No. 71-361, 46 Stat. 590 (codified as amended in scattered sections of 19 U.S.C.). After Commerce initiates an investigation into some defined class of imported goods, the ITC is to determine whether there is a "reasonable indication" that a U.S. industry is materially injured or threatened with material injury, or the establishment of an industry in the U.S. is materially retarded, due to non-negligible amounts of the imports. 19 U.S.C.

§ 1673b(a)(1).[1] If the ITC's determination is affirmative, Commerce is to make a preliminary determination of whether there is a "reasonable basis to believe or suspect" that the subject merchandise is been sold, or is likely to be sold, at less than fair value. § 1673b(b)(1)(A). If Commerce's preliminary determination is also affirmative, Commerce then is to calculate the estimated weighted average dumping margins, *i.e.*, the amount by which the normal value (roughly, home-country value) of the merchandise exceeds the export price (roughly, U.S. price), and it orders the posting of a cash deposit or bond for each entry based on those margins, as well as the suspension of liquidation (the final computation of duties) of entries subject to the determination. § 1673b(d)(1), (2).

Ordinarily, Commerce then continues the investigation and, within 75 days of the preliminary determination, makes a final determination of whether the merchandise is being, or is likely to be, sold in the U.S. at less than fair value. § 1673d(a)(1). If it finds such sales, it calculates estimated weighted average dumping margins for each exporter individually investigated and an estimated all-others rate for those not individually investigated. § 1673d(c)(1)(B). The ITC then makes its final injury determination. § 1673d(b)(1). If both determinations are affirmative, Commerce issues an antidumping duty order that directs customs officers to assess an antidumping duty equal to the margins calculated in the final determination. § 1673d(c)(2); § 1673e(a).

These appeals concern a congressionally authorized departure from that ordinary course of proceedings. If Commerce determines that "extraordinary circumstances" are present, it may suspend an investigation upon the

---

[1]    Hereafter we generally (though not always) cite sections of Title 19 without including "19 U.S.C." Other statutory citations include the U.S. Code title number.

execution of a suspension agreement, pursuant to § 1673c(c), with "substantially all" exporters of the subject merchandise (defined as not less than 85% of exporters by value or volume, *see* § 1673c(c)(1); 19 C.F.R. § 351.208(c)). The agreement must eliminate the injurious effects of the sales at issue and ensure that the amount by which the normal value of the merchandise exceeds the export price does not exceed 15% of the dumping margin of the less-than-fair-value entries examined during the investigation. § 1673c(c)(1)(B). Once the agreement is executed, Commerce releases the cash deposits or bonds and terminates the suspension of liquidation. § 1673c(f). Within 20 days of the publication of a suspension agreement, however, if continuation of the investigation is requested either by "an exporter or exporters accounting for a significant proportion of exports to the United States of the subject merchandise" or by another designated "interested party" (specifically, any of various domestic-industry entities), Commerce "shall continue the investigation" and proceed toward a final determination. § 1673c(g).[2] But even if the final determination in the continued investigation is

---

[2]   Besides the specified exporters, the statute authorizes "an interested party described in subparagraph (C), (D), (E), (F), or (G) of [§ 1677(9)] which is a party to the investigation" to request continuation. § 1673c(g)(2). The first four referred-to provisions address "domestic like product" entities—manufacturers, producers, and wholesalers of a domestic like product, unions or similar worker groups, and certain associations such as trade associations. § 1677(9)(C), (D), (E), (F). The fifth provision refers to a coalition or trade association of processors (with or without producers or growers) of "a processed agricultural product" when an investigation involves a (domestic) industry engaged in producing such a product. § 1677(9)(G); *see* § 1677(9)(4)(A), (E). We hereafter refer to the five groups as "domestic-industry entities" for simplicity.

affirmative, Commerce may not issue an antidumping duty order as long as the suspension agreement remains in force and continues to meet statutory requirements. § 1673c(f)(3)(B).

## B

Commerce initiated an investigation in April 1996 to determine whether fresh tomatoes from Mexico were being sold in the U.S. at less than fair value. Initiation of Antidumping Duty Investigation: Fresh Tomatoes from Mexico, 61 Fed. Reg. 18,377 (Apr. 25, 1996). After the ITC made a preliminary determination of injury to a U.S. industry in May 1996, Commerce issued a preliminary determination finding a reasonable basis to believe that imported tomatoes from Mexico were being sold, or were likely to be sold, in the U.S. at less than fair value. Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Fresh Tomatoes From Mexico, 61 Fed. Reg. 56,608 (Nov. 1, 1996) (*Preliminary Determination*). Pursuant to § 1673b(d)(1)(A), Commerce calculated an "estimated weighted average dumping margin" for each exporter that was individually investigated and an "estimated all-others rate." Because the three plaintiffs before us here were not individually investigated, they were subject to the all-others rate.

On the same day, Commerce announced that it had signed a suspension agreement (the 1996 Agreement) pursuant to § 1673c(c) with exporters accounting for substantially all exports of fresh tomatoes from Mexico. Suspension of Antidumping Investigation: Fresh Tomatoes From Mexico, 61 Fed. Reg. 56,618 (Nov. 1, 1996). One signatory to the agreement was Asociación Mexicana de Horticultura Protegida, A.C. (AMHPAC), of which, it is undisputed before us, Bioparques de Occidente and Agricola la Primavera are members. The 1996 Agreement suspended the anti-dumping investigation, authorized the release of the cash deposits or bonds and the termination

of suspension of liquidation, and required that exporters sell their tomatoes in the U.S. at or above specified reference prices. *Id.* at 56,618–19. The reference prices were calculated as the average of the lowest average monthly prices in the U.S. market in 1992–1994. *Id.* at 56,620–21 (Appendix A).

In May 2002, a significant percentage of Mexican signatories provided notice of their withdrawal from the agreement, and as a result the Agreement no longer covered substantially all imports of fresh tomatoes from Mexico. Commerce terminated the Agreement pursuant to § 1673c(i)(1), announced its intention to suspend liquidation and to require deposits under § 1673b(d)(1)(B) based on the 1996 preliminary-determination rates, and resumed the investigation. But in December 2002, another suspension agreement was reached. Suspension of Antidumping Investigation: Fresh Tomatoes From Mexico, 67 Fed. Reg. 77,044 (Dec. 16, 2002). The sequence repeated itself in 2008 and 2013, leading to the 2008 and 2013 Agreements.

On February 6, 2019, Commerce notified the Mexican signatories of its intent to withdraw from the 2013 Agreement. On May 7, 2019, Commerce withdrew from the 2013 Agreement, resumed the antidumping investigation, ordered a suspension of liquidation, and required cash deposits based on the 1996 preliminary-determination rates. In resuming the 20-year-old investigation, Commerce selected as mandatory respondents a new group of Mexican exporters, including Bioparques de Occidente. Fresh Tomatoes From Mexico: Suspension of Antidumping Investigation, 84 Fed. Reg. 49,987, 49,988 (Sept. 24, 2019).

When Commerce withdrew from the 2013 Agreement, several associations of individual Mexican fresh tomato growers (including AMHPAC) sued in the Trade Court and asked for a preliminary injunction against the withdrawal and investigation resumption. In June 2019, the Trade Court denied the request for insufficient showings of

irreparable harm and likely success on the merits. *Confederacion de Asociaciones Agricolas del Estado de Sinaloa, A.C. v. United States*, 389 F. Supp. 3d 1386 (Ct. Int'l Trade 2019) (*CAADES*). In July 2019, we then denied mandamus relief from the Trade Court's denial. *In re Confederacion de Asociaciones Agricolas del Estado de Sinaloa, et al.*, 781 F. App'x 982 (Fed. Cir. 2019). We agreed that success on the merits was unlikely, noting that Commerce was permitted to withdraw under the termination clause of the 2013 Agreement. *Id.* at 987.

On September 19, 2019, Commerce announced that the parties had signed a new suspension agreement (the 2019 Agreement). Fresh Tomatoes from Mexico: Suspension of Antidumping Duty Investigation, 84 Fed. Reg. at 49,987–89. The 2019 Agreement set higher reference prices, while retaining each signatory's obligation not to exceed its dumping margin examined during the investigation by 15%, and imposed monitoring and inspection to assess compliance with the Agreement's requirements. *Id.* at 49,990–94. The Agreement also allowed either Commerce or the Mexican signatories to withdraw without penalty. *Id.* at 49,994. After the 2019 Agreement was signed, the plaintiffs in *CAADES* stipulated to dismissal.

Commerce then received timely requests to continue the investigation under § 1673c(g) from domestic tomato growers Florida Tomato Exchange and Red Sun Farms. Commerce therefore continued the investigation. On October 25, 2019, it published its final determination that tomatoes from Mexico were being, or were likely to be, sold in the U.S. at less than fair value. Fresh Tomatoes from Mexico: Final Determination of Sales at Less than Fair Value, 84 Fed. Reg. 57,401 (Oct. 25, 2019) (*Final Determination*). Commerce calculated a dumping margin of 30.48% for Bioparques de Occidente and Agricola La Primavera and a 20.91% all-others rate. *Id.* at 57,402. The ITC published its determination of material injury to a U.S. industry on December 12, 2019. Fresh Tomatoes from

Mexico, 84 Fed. Reg. 67,958 (Dec. 12, 2019). But no anti-dumping order issued because the 2019 Agreement remained in force and valid. *See Final Determination*, 84 Fed. Reg. at 57,403 ("Commerce will not issue an anti-dumping duty order so long as . . . [t]he 2019 Agreement remains in force . . . .").

Between November 2019 and February 2020, Bioparques filed three very similar complaints challenging Commerce's withdrawal from the 2013 Agreement and its *Final Determination*: USCIT Nos. 19-00204, 19-00210, and 20-00035. Bioparques alleged that Commerce lacked authority to withdraw from the 2013 Agreement and continue the investigation, that Commerce's examination of Bioparques as a new respondent in an allegedly compressed investigation violated Bioparques's due process rights, that Commerce committed timing and procedural errors in reaching its final determination, and that Commerce used incorrect methodologies to calculate the rates in its final determination. Bioparques requested that the Trade Court declare the 2019 *Final Determination* invalid and vacate Commerce's withdrawal from the 2013 Agreement.

The complaints asserted different bases for jurisdiction. In No. 19-00210, Bioparques invoked § 1516a(g)(3)(A)(i), addressing final determinations involving free trade area countries, which, if applicable, would support Trade Court jurisdiction under 28 U.S.C. § 1581(c). J.A. 60–68. In No. 19-00204, Bioparques invoked § 1516a(a)(2)(A) and § 1516a(a)(2)(B)(iv), which, if applicable, also would support Trade Court jurisdiction under 28 U.S.C. § 1581(c). J.A. 51–59. Finally, in No. 20-00035, Bioparques asserted jurisdiction under 28 U.S.C. § 1581(i)(4) (now 28 U.S.C. § 1581(i)(1)(D)), the residual clause covering actions arising out of laws "providing for . . . administration and enforcement" of tariffs and duties. J.A. 69–76.

The government moved to dismiss under USCIT Rule 12(b)(1) for lack of subject matter jurisdiction and USCIT Rule 12(b)(6) for failure to state a claim upon which relief could be granted. S.Appx. 113–15. On September 11, 2020, the Trade Court issued identical decisions in all three cases, dismissing the complaints under Rule 12(b)(1). *Bioparques de Occidente, S.A. de C.V. v. United States*, 470 F. Supp. 3d 1366 (Ct. Int'l Trade 2020). The court held that Bioparques's claims regarding the *Final Determination* did not "present an actual case or controversy" because Bioparques (as a member of AMHPAC) was a signatory to the still-in-force 2019 Agreement, which prevented an antidumping duty order from being issued, meaning that Bioparques was suffering "no concrete or particularized injury" from the *Final Determination*. *Id.* at 1372. For that reason alone, and not for want of fitness of the issues for adjudication, the court held this challenge "unripe." *Id.* The court then held that the challenges to Commerce's termination of the 2013 Agreement became moot when Bioparques (via its representatives) signed the superseding 2019 Agreement. *Id.* at 1373. Addressing both challenges, the court added that it could not "condone Bioparques' litigation strategy in reaping the benefits of the 2019 Suspension Agreement while bringing an after-the-fact challenge to the final determination that currently has no impact and demanding that the court resurrect the 2013 Suspension Agreement when the claims here are not yet (and may never be) ripe." *Id.* Having held that the claims were, respectively, unripe and moot, the court did not reach other issues, such as whether the claims regarding the *Final Determination* were timely filed. *Id.*

Bioparques timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## II

We need not separately analyze Bioparques's challenges to the termination of the 2013 Agreement and

negotiation of the 2019 Agreement.  In *Confederacion de Asociaciones Agricolas del Estado de Sinaloa, A.C. v. United States*, No. 2020-2232, we today conclude that materially identical challenges, though not moot in a jurisdictional sense, state no plausible claim on which relief can be granted and must therefore be dismissed under Rule 12(b)(6).  That holding controls our disposition of the same issue in this case.  This aspect of Bioparques's complaint must be dismissed, leaving Bioparques's challenges to the *Final Determination* for separate consideration.

## III

## A

The Trade Court granted the Rule 12(b)(1) motion to dismiss on the ground that Bioparques's challenges to the *Final Determination* do not currently present a justiciable case or controversy, as required by Article III for subject matter jurisdiction.  We review such a dismissal de novo.  *See, e.g.*, *Hutchinson Quality Furniture, Inc. v. United States*, 827 F.3d 1355, 1359 (Fed. Cir. 2016) (Trade Court's jurisdictional dismissal reviewed de novo); *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1348 (Fed. Cir. 2015) (ripeness dismissal reviewed de novo); *Ford Motor Co. v. United States*, 688 F.3d 1319, 1323 (Fed. Cir. 2012) (non-justiciability dismissal reviewed de novo); *Totes-Isotoner Corp. v. United States*, 594 F.3d 1346, 1350 (Fed. Cir. 2010) (lack of jurisdiction, lack of standing, and non-justiciability present legal questions decided de novo).  At the motion to dismiss stage, we "must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant."  *Hutchinson*, 827 F.3d at 1359 (citation omitted).

The Trade Court relied solely on its determination of no justiciable case or controversy in deeming Bioparques's challenge to the *Final Determination* to be not jurisdictionally ripe, correctly not finding any lack of fitness of the issues for judicial review.  *Bioparques* 470 F. Supp. 3d at

1372–73. We therefore limit our discussion to the determination that Bioparques lacks a present, concrete interest required for justiciability. We reverse that determination, concluding that Bioparques's interest is adequate under Supreme Court authority—in particular, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007). Although there might be additional bases for deeming Bioparques's interest constitutionally adequate, we need not so decide. Our conclusion applying *MedImmune* to the present circumstances suffices to hold that the challenge to the *Final Determination* here is justiciable and, accordingly, ripe for adjudication.[3]

For a dispute to present a justiciable case or controversy, it must be "'definite and concrete, touching the legal relations of parties having adverse legal interests'; and . . . 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *MedImmune*, 549 U.S. at 127 (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41 (1937)). In *MedImmune*, the plaintiff was paying ongoing royalties for a license to a patent and sought a declaratory judgment that the patent was invalid or not infringed. *Id.* at 121–22. The Court recognized that there was

---

[3]    The close relationship among the Article III case-or-controversy doctrines, such as ripeness and justiciability, is well recognized. *See, e.g.*, *MedImmune*, 549 U.S. at 128 n.8; *Fisher v. United States*, 402 F.3d 1167, 1176 (Fed. Cir. 2005); 13 C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 3529 & n.6 (3d ed. 2021). Here, the government identifies the controlling issue when it argues: "[W]hether the issue is one of standing or one of ripeness, Bioparques's claims are non-justiciable because appellants suffer no real or present or concrete injury." Gov't Br. at 40.

undisputedly a justiciable concrete controversy between the parties—legal liability for patent infringement would continue or end, depending on the outcome—subject only to one possible objection raised by the patent holder. *Id.* at 128. The objection was that the plaintiff, by agreeing to the terms of the license, had purchased an "insurance policy, immunizing it from suits for infringement," and that it should not be able to "enjoy[] its immunity while bringing a suit" to challenge the patent. *Id.* at 134–35.

The Supreme Court rejected that objection. It held that, to establish a justiciable case or controversy under Article III, a patent licensee is not required to terminate the license before seeking a declaratory judgment that the licensed patents are invalid or not infringed. *Id.* at 137. The Court also rejected a requirement that, for justiciability of a declaratory-judgment challenge, the plaintiff must have a "reasonable apprehension of imminent suit." *Id.* at 132 n.11. The Court determined that there was a justiciable case or controversy even though the plaintiff's own acts (*i.e.*, remaining in the agreement and paying royalties) "eliminate[d] the imminent threat of harm." *Id.* at 128. In other words, as this court has subsequently explained, a licensee is "not required to cease its contract payments," thereby opening itself to greater liability, "in order to resolve its disputed contract rights." *Apple Inc. v. Qualcomm Inc.*, 992 F.3d 1378, 1383 (Fed. Cir. 2021) (finding *MedImmune* inapplicable where "the validity of the challenged patents" would not affect the plaintiff's "ongoing royalty obligations"); *Apple Inc. v. Qualcomm Inc.*, 17 F.4th 1131, 1134 (Fed. Cir. 2021) (similar); *see MedImmune*, 549 U.S. at 130–32 (discussing *Altvater v. Freeman*, 319 U.S. 359 (1943)).

The Court in *MedImmune* also considered and rejected the patent owner's invocation of the common-law rule that "a party to a contract cannot at one and the same time challenge its validity and continue to reap its benefits." 549 U.S. at 135. The Court explained that the plaintiff was not

repudiating the contract, but instead was "asserting that the contract, properly interpreted, d[id] not prevent it from challenging the patents, and d[id] not require the payment of royalties" because if either the patent was invalid or there was no infringement, the licensee need not pay royalties at all. *Id.*; *see also id.* at 123–24. The Court applied to the dispute between private parties before it the principle recognized in government-private disputes: "where threatened action by *government* is concerned," a plaintiff is not required to "expose himself to liability before bringing suit to challenge the basis for the threat." *Id.* at 128–29; *see also Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 981 F.3d 1360, 1371 (Fed. Cir. 2020).

In this case, we conclude, the 2019 Agreement is no more a bar to justiciability than was the patent license in *MedImmune*. The Trade Court deemed the dispute over the *Final Determination* non-justiciable because, as long as the 2019 Agreement is in force and governs Bioparques, no antidumping duty order based on the *Final Determination* may issue; and the court said that it could not condone Bioparques's "litigation strategy" of "reaping the benefits of the 2019 Suspension Agreement" while at the same time bringing a challenge to the *Final Determination*. *Bioparques,* 470 F. Supp. 3d at 1372–73. But the Supreme Court rejected a materially analogous objection to justiciability in *MedImmune*—where the plaintiff was complying with the patent license, thereby forestalling an assertion of liability that would (non-speculatively) occur if the plaintiff stopped paying royalties. Under *MedImmune,* which allowed the plaintiff to challenge the basis for patent liability without withdrawing from the license agreement, Bioparques need not withdraw from the 2019 Agreement, exposing itself to greater liability (through the issuance of an antidumping order), in order to challenge the basis for antidumping liability under Commerce's *Final Determination*.

The particularized, concrete interest Bioparques has in challenging the *Final Determination* is far from speculative. In particular, Bioparques alleges errors by Commerce that, if proved, could result in a negative determination on dumping and consequent automatic termination of the 2019 Agreement. *See* § 1673c(f)(3)(A) (explaining that, if the final determination by either Commerce or the ITC is negative, "the agreement shall have no force or effect and the investigation shall be terminated"). The agreement would similarly be terminated if the revised antidumping margins were found to be de minimis, *see* § 1673d(a)(4), defined as less than 2 percent ad valorem, § 1673b(b)(3). Thus, like the licensee in *MedImmune*, who was paying royalties to practice the patent but could have stopped without liability upon a favorable adjudication of invalidity or non-infringement, *see* 549 U.S. at 135, Bioparques could avoid the burdens of both the 2019 Agreement (with its minimum reference prices and other obligations) and antidumping duties upon a favorable adjudication of the challenges to the *Final Determination*.

Even if Bioparques's challenges to the *Final Determination* were to succeed only in reducing, but not eliminating, antidumping duties, Bioparques still would have a plausible, particularized interest in its challenge. Partial success in litigation would alter the level of duties that is the crucial comparator in Bioparques's decision whether to remain in the 2019 Agreement—a decision that the Trade Court and the government recognize Bioparques is free to make "for any reason, or for no reason at all." *Bioparques*, 470 F. Supp. 3d at 1373; Gov't Br. at 16 (explaining that Bioparques may "withdraw from the agreement with no change to the signatory status" of other AMHPAC members). Neither the Trade Court nor the government in this case cites authority establishing that, or providing a persuasive reason why, the interest in altering the legal landscape in this way is insufficient for a justiciable controversy. The Trade Court and the government (and

the Florida Tomato Exchange) assert that Bioparques must give up the current protection of the 2019 Agreement in order to challenge the *Final Determination*, but that assertion is counter to *MedImmune*, as we have explained.

Congress itself recognized that exporters, necessarily including signatories, have an interest in a final determination in a continued investigation after execution of a suspension agreement. The Tariff Act provides that, after publication of a suspension agreement, not only specified domestic-industry entities but also "an exporter or exporters accounting for a significant proportion of exports . . . of the subject merchandise" may request that the investigation be continued and that, upon receipt of such a request, Commerce must in fact continue the investigation—the object of which is to reach a final determination. § 1673c(g). This provision rests on the evident premise that signatories to a suspension agreement—who must, for the agreement to be proper under § 1673c(c), account for "substantially all" exports—are among those who have a concrete interest in securing a correct final determination even if the suspension agreement is still in force.

We hold, therefore, that Bioparques has presented a justiciable case or controversy under Article III in its challenge to the *Final Determination*. We reverse the Trade Court's determination that the challenge is not ripe.

B

We next consider whether statutory jurisdiction exists over Bioparques's challenge to Commerce's *Final Determination*—specifically, whether the Tariff Act of 1930 provides such jurisdiction where no antidumping duty order has issued. The question was presented to the Trade Court, but that court did not reach it, instead dismissing for lack of jurisdiction on constitutional grounds. Because we reverse the Trade Court's constitutional conclusion, we reach the issue of statutory jurisdiction.

Bioparques asserted alternative statutory bases for the Trade Court's jurisdiction over the challenge to Commerce's *Final Determination* before the entry of an antidumping duty order. It asserted jurisdiction based on §§ 1516a(g)(3)(A)(i) and 1516a(a)(2)(B)(i); and it also asserted jurisdiction based on §§ 1516a(a)(2)(A)(i) and 1516a(a)(2)(B)(iv), as well as on 28 U.S.C. § 1581(i)(4) (now 28 U.S.C. § 1581(i)(1)(D)). We reach only the first ground here. It has not been disputed that this jurisdictional basis, if present, suffices for Bioparques to obtain the relief it seeks if it proves its case.

Under 28 U.S.C. § 1581(c), the Trade Court has "exclusive jurisdiction of any civil action commenced under section 516A or 517 of the Tariff Act of 1930." Section 516A, codified as 19 U.S.C. § 1516a, provides for judicial review of some determinations in antidumping duty proceedings (and countervailing duty proceedings, not at issue here). And it sets timing rules—which are generally jurisdiction-limiting—governing when challenges may be brought. *See* 28 U.S.C. § 2636(c) (barring a challenge to a reviewable determination in 19 U.S.C. § 1516a unless it is commenced within the time specified in that section); *Georgetown Steel Corp. v. United States*, 801 F.2d 1308, 1312 (Fed. Cir. 1986) (determining that the Trade Court lacked jurisdiction where the complaint was not timely filed under 19 U.S.C. § 1516a).

One of the "[r]eviewable determinations" discussed in § 1516a is a "[f]inal affirmative determination[] by the administering authority and by the Commission under section . . . 1673d of this title, including any negative part of such a determination." § 1516a(a)(2)(B)(i) (ellipsis where § 1671d, concerning countervailing duties, appears) [hereafter "B(i)"]. The referred-to § 1673d addresses affirmative final determinations in antidumping duty investigations, *i.e.*, final determinations that the subject merchandise is being, or is likely to be, sold in the U.S. at less than fair value, § 1673d(a)(1), like the *Final Determination*

published here.  But it is not disputed before us that, in most antidumping proceedings, such an affirmative final determination under B(i) may be challenged only during a defined period—starting on the date of publication of an antidumping duty "*order* based upon" that affirmative final determination and ending 30 days later.  *See* § 1516a(a)(2)(A)(i)(II) (emphasis added).  And no such order has been issued based on the *Final Determination* here because of the 2019 Agreement, a fact that would block review here if that prerequisite applied.

But special rules are available for review of antidumping duty determinations involving free trade area (FTA) countries, of which Mexico is one.[4]  "Determination" under the FTA rules is defined to include, among others, a B(i) determination.  § 1516a(g)(1)(B).  Further, a B(i) determination is reviewable under § 1516a(a) if "neither the United States nor the relevant FTA country requested review by a binational panel pursuant to article 1904 of the [United States-Canada Free-Trade Agreement] or article 10.12 of the [United States-Mexico-Canada Agreement]." § 1516a(g)(3)(A)(i).  And, of particular importance here, FTA-country antidumping duty review actions are not subject to the rule for non-FTA countries (not disputed here, as noted above) that a party cannot challenge an affirmative final antidumping duty determination until after an antidumping duty *order* has been published.  Reviewability

---

[4]    When Bioparques's complaint was filed, a "[f]ree trade area country" was defined to include Canada and Mexico for such time as the North American Free Trade Agreement (NAFTA) was in force.  *See* 19 U.S.C. §§ 1516a(f)(8), (10) (2006). NAFTA has since been replaced by the United States-Mexico-Canada Agreement (USMCA).  The statute was amended in 2020 to define a "[r]elevant FTA country" as Canada and Mexico for such time as the USMCA is in force.  19 U.S.C. § 1516a(f)(9).

of an FTA country affirmative final determination requires no such order; the period of review is defined with reference only to "the date on which notice of *the determination* is published in the Federal Register." § 1516a(a)(5)(A) (emphasis added). Specifically, the period for filing begins on the 31st day after the day of publication of the determination (not an order based on it), *id.*, with a summons due within the next 30 days and a complaint due 30 days after the summons, § 1516a(a)(2).[5]

Here, Bioparques has argued for jurisdiction under B(i) based on the special provisions available in the FTA context. And neither the government nor the Florida Tomato Exchange has offered evidence or argument that any jurisdictional prerequisite has not been met. It is undisputed that no binational panel was sought, and there has been no dispute about the timeliness of Bioparques's summons and complaint. J.A. 45–46; J.A. 60–68. Nor has the timeliness of notice been challenged before us. *See supra* n.5; Bioparques Br. at 16. In this appeal, the parties dispute only whether the *Final Determination* is a B(i) final affirmative determination.

The text of B(i) makes plain that it is. The provision allows for review of "[f]inal affirmative determinations by the administering authority and by the Commission under

---

[5]   A special notice rule also applies in the FTA context. "[T]he party seeking to commence review [must] provide[] timely notice of its intent to commence such review to" three sets of parties—the "United States Secretary" and "relevant FTA [country] Secretary" (both defined by reference to the USMCA); all interested parties to the proceeding in connection with which the matter arises; and the administering authority or the Commission, as appropriate—within a specified period. § 1516a(g)(3)(B); § 1516a(a)(5); § 1516a(f). We do not determine the precise meaning of this requirement or whether it is jurisdictional.

section . . . 1673d of this title, including any negative part of such a determination." § 1516a(a)(2)(B)(i).  The clause does not exclude a final affirmative determination from review just because it was reached in a continued investigation, as opposed to an investigation never interrupted by a suspension agreement.  Section 1673d itself, to which this clause refers, is broadly titled "[f]inal determinations" and similarly does not exclude final determinations in continued investigations from the definition of "final determinations."  The government has noted that § 1673c, which provides for continued investigations and final determinations in such investigations, is not identified in clause B(i).  Gov't Br. at 52.  But § 1673c itself makes clear that "[w]here [the] investigation is continued," a "final determination by the administering authority or the Commission" is a final determination "*under section 1673d of this title.*" § 1673c(f)(3) (emphasis added).  So the *Final Determination* comes with B(i)'s coverage of § 1673d.

The government agreed at oral argument that nothing in the language of B(i) excludes from its coverage a final affirmative determination made in a continued investigation in the suspension-agreement setting.  Oral Arg. at 1:30:53–1:31:30.  But it suggested that we should hold such a final determination in a continued investigation to be silently excluded from the plain-meaning coverage of B(i) because such a final determination is mentioned elsewhere in the list of reviewable determinations.  Specifically, under § 1516a(a)(2)(B)'s declaration that what "follows" are reviewable decisions, clause (iv) covers a "determination . . . to suspend" an antidumping duty investigation, "including any final determination resulting from a continued investigation which changes the size of the dumping margin . . . at the time the suspension agreement was concluded."  But that mention is not enough to override the plain meaning of B(i).  The language of B(i) provides no hook for the suggested exclusion.  And there is no conflict between the two provisions; nor has any other basis been presented to us

that explains why the same Commerce decision might not be covered by more than one review provision.[6]  In short, we have been shown no sufficient basis to do anything but follow the plain language of B(i), which covers the *Final Determination* here.

We hold that an affirmative final determination in a continued investigation that involves exports from an FTA country is reviewable under § 1516a(g)(3)(A)(i) as a determination under § 1516a(a)(2)(B)(i), which provides the Trade Court jurisdiction under 28 U.S.C. § 1581(c).  On the record before us, those provisions support Trade Court jurisdiction over Bioparques's challenge to the *Final Determination.*

IV

For the foregoing reasons, we affirm the dismissal of Bioparques's challenge to the termination of the 2013 Agreement, reverse the determination that Bioparques's challenge to the final determination did not present a justiciable case or controversy, and remand for further proceedings consistent with our determinations about the availability of statutory jurisdiction.

The parties shall bear their own costs.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**

---

[6]   The government agrees that, although the FTA-specific review provision, § 1516a(g)(1)(B), lists as reviewable the determinations identified in clause (i) but not those identified in clause (iv) of § 1516a(a)(2)(B), the FTA-specific provision does not occupy the field of review for FTA-country parties, which may separately invoke the general provisions, including § 1516a(a)(2)(B)(iv), if their terms are satisfied.  Gov't Br. at 50–51.